

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 19, 2012

**BY HAND**

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

        Re:    **United States v. Ervan Purnell,**
                 **12 Cr. 6 (PAE)**

Dear Judge Engelmayer:

      Sentencing in the above-captioned matter is scheduled for September 27, 2012, at 2:15 p.m. The Government respectfully submits this letter in connection with that sentencing and in response to the defendant's August 22, 2012 submission ("Def Ltr.").

      Ervan Purnell ("Purnell" or the "defendant") was convicted after a jury trial of one count of assaulting a federal employee with a deadly or dangerous weapon, in violation of Title 18, Sections 111(a) and (b) of the United States Code. The evidence at trial established that on December 23, 2011, Purnell violently assaulted a pharmacist, Mohinder Sharma, with his cane at the VA Medical Center in Manhattan. In the face of testimony from the victim and multiple eyewitnesses and video evidence, the defendant testified at trial and repeatedly lied to the jury. Literally adding insult to injury, the defendant attempted to shift the blame for this incident to the victim, claiming that Mr. Sharma attacked him with a telephone and advanced upon him further – somehow justifying his own victimization by Purnell and his wooden cane. Even now, at the sentencing stage, Purnell sidesteps any discussion of the offense conduct, thus continuing to take no responsibility for his violent attack.

      Instead, Purnell makes several arguments in favor of leniency. The defendant suggests that his age minimizes the odds of recidivism. He urges that his prosecution and incarceration to date are sufficient enough to deter him from committing more crimes. Finally, he asks that the Court give him a below-Guidelines sentence in light of his various physical ailments.

The Court should reject each of these arguments. For the reasons set forth below, the Government respectfully submits that the appropriate Guidelines range is 108 to 135 months' imprisonment – a range that reflects the defendant's repeated perjury at trial – and submits that a sentence within that range is appropriate. Such a sentence would be sufficient but not greater than necessary to serve the purposes of sentencing, as it would reflect the serious of the attack on Mr. Sharma, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence of criminal conduct.

## Background

### A. The Offense Conduct

Purnell was charged in a one count Indictment, 12 Cr. 6 (PAE) (the "Indictment"). Count One charged that on December 23, 2011, Ervan Purnell attacked an official working at the Veterans Affairs Medical Center in Manhattan with a deadly and dangerous weapon, causing bodily injury.

On the day of the attack, the victim was employed as a pharmacist, working in a basement clinic at the Medical Center. Patients visited his small office in order to consult with him on how to take their medications. The evidence at trial overwhelmingly established that Purnell stormed through a nearby waiting area and into Sharma's office on the afternoon of December 23. He angrily confronted the pharmacist over the packaging in which he had received his medications, yelling at him and banging his cane against the doorframe. The pharmacist, still seated at his desk as Purnell stood before him, informed Purnell that he would have to call the police if Purnell did not calm down. When Purnell did not relent, the pharmacist turned to his desk to reach for the phone to call police. At that point, the defendant lifted his cane and struck the pharmacist on the side of his head. The wound left by the impact required seven staples to close. Seconds later, when the first VA Police Officer arrived at the scene, she saw the defendant standing over the bloodied victim, cane raised, ready to strike again. Within moments, Purnell made up a lie that he would stick to throughout the ensuing prosecution – that the victim had hit him with a telephone.

Trial testimony and evidence overwhelmingly demonstrated that Purnell's claim was a lie. The victim testified about the defendant's hostile behavior in the doorway, and the defendant's violent response to his attempt to call for help. (Tr. 162-169.) Two additional eyewitnesses, Raymond Seay and Lazar Moore, testified to having seen Purnell strike the seated victim with his cane. (Tr. 39-40 (Seay), 50-52 (Moore). Both witnesses had been watching the events in the office unfold from the waiting area outside prior to the attack. Both witnesses testified that although they witnessed the verbal altercation that preceded the offense, neither observed Sharma attack Purnell or provoke him in any other way. Police Officer Cherlene Dunston testified that when she arrived shortly after, Purnell was poised to attack the injured and semi-conscious victim a second time. (Tr. 113.) Emergency room photographs underscored the extent of the victim's injuries. Finally, security footage of the waiting area adjacent to Sharma's office confirmed the

Honorable Paul A. Engelmayer
September 19, 2012
Page 3

timeline of events – Purnell's arrival in Sharma's office, the witnesses' reaction to the assault, and Dunston's arrival – and established the clear vantage points that Seay and Moore had of the events. The evidence made it clear that Purnell assaulted Sharma, and had no self-defense or other justification.

      B.      **Purnell's Trial Testimony**

Purnell testified in his own defense at trial and perjured himself repeatedly. He repeated and further developed the lie that he first told witnesses and law enforcement on the day of the event: that the victim had attacked with a telephone, and had only bludgeoned him with his cane in self-defense. Purnell claimed that the victim had responded to his question by yelling, "Get the hell out of my office," and that when Purnell moved closer to him, the victim "bashed [him] in the face" with the telephone on his desk. (Tr. 197.) Purnell then claimed that even as he reeled backward, the victim came after him with the telephone, forcing him to hit the victim with his cane. (Id.) On cross examination, the defendant added to these lies, claiming that after the attack, he had backed away, into the waiting area. This contradicted the testimony of Moore and Dunston, each of whom had testified to seeing the defendant standing in Sharma's office after the attack.

      C.      **The Presentence Investigation Report**

The PSR calculates the offense level using Sentencing Guidelines § 2A2.2, the section for aggravated assault. (PSR ¶ 25.) The PSR explains that because a dangerous weapon was used in the offense, a three-level enhancement is applicable pursuant to U.S.S.G. § 2A2.2(b)(2)(C). (PSR ¶ 26.) The PSR further explains that because the victim sustained bodily injury, an additional three-level enhancement applies under U.S.S.G § 2A2.2(b)(3)(A). (PSR ¶ 27.) The PSR also notes that because the defendant was convicted under Title 18, United States Code, Section 111(b), a two-level enhancement applies. (PSR ¶ 28.) Further, the PSR notes that a six-level enhancement applied because the victim in this case was an "official victim" under U.S.S.G § 3A1.2(b). (PSR ¶ 28.)

Finally, the PSR correctly indicates that the Government seeks a two-level increase for obstruction of justice based upon the defendant's perjury at trial. The Probation Office defers to the Court on the application of the obstruction-of-justice enhancement. (PSR ¶ 31.) Without obstruction of justice points, the defendant's adjusted offense level is 28. (PSR ¶ 111.)

The PSR also outlines the defendant's robust and varied criminal history. Beginning in 1971, the defendant has sustained convictions for such crimes as Robbery in the Second Degree (in which he attacked a 90-year-old man with a knife, knocked him to the ground and stole his money) (PSR ¶ 48), and numerous instances of drug-related offenses that resulted in sentences of over a year's imprisonment, including, most recently, an 8-to-16 year sentence for selling crack on school grounds. (PSR ¶ 60.) Because only the most recent of these offenses counts for purposes of Purnell's Criminal History score, his Criminal History Category is II.

Honorable Paul A. Engelmayer
September 19, 2012
Page 4

The defendant's Guidelines range as articulated by the PSR is therefore 87 to 108 months' imprisonment. (PSR ¶ 111.)  The Probation Office recommends a sentence at the bottom of the Guidelines range.

Although the Probation Office does not weigh in on the subject of obstruction points, it does note that the defendant has been uncooperative and defiant in its dealings with that Office. The Probation Office notes that the defendant "was largely uncooperative during the interview: he did not sign release forms, refused to address issues in a complete and forthright manner; and manifestly lied about his history of drug use—he had cocaine in his system when he was arrested." (PSR at 24.)

## Discussion

### A.   Obstruction of Justice Points Should Apply to the Defendant

The defendant did not respond to the notice of the Government's intention to seek points for obstruction of justice under Section 3C1.1 of the Guidelines.  Two points should, in fact, be added.  An enhancement under Section 3C1.1 for perjured testimony applies where a defendant willfully and materially committed perjury, which is the intentional giving of false testimony as to a material matter.  United States v. Salim, 549 F.3d 67, 73 (2d Cir. 2008).  Material evidence is evidence that "if believed, would tend to influence or affect the issue under determination."  Id., U.S.S.G § 3C1.1, comment (n. 6).  At trial, Purnell made a number of false statements that were central to the charges against him.  Plainly, testimony that tended to support a self-defense justification is material; had the jury believed such testimony, the affirmative defense of self-defense would have justified a vote of acquittal even though the Government had proven every single element of the offense.

As the jury must have concluded, Purnell's trial testimony was a parade of false statements concerning that material matter.  (Tr. 196-199.)  Purnell's detailed, specific, and entirely made-up account of the events of December 23, 2012 included testimony that the victim picked up a telephone and "bashed" him in the face with it, that the victim continued to advance upon him after this "assault," and that Purnell backed out of the office once he realized that he had sufficiently repelled this fictitious attack.  Each and every one of these points was contradicted by eyewitness testimony.

Given the defendant's repeated lies under oath about matters central to the charged conduct, this is a paradigmatic case for applying Section 3C1.1.[1]  With two obstruction points added, Purnell's Offense Level totals 30.  At Criminal History Category II, the defendant's Guidelines Range becomes 108 to 135 months' imprisonment.

---

[1] Purnell's apparent refusal to cooperate with the Probation Office, including lies concerning his drug use, also support the application of obstruction points.  See U.S.S.G §3C1.1, comment (n. 4(H)).

### B. A Guidelines Sentence is Appropriate

Even prior to his perjury at trial, the defendant's consistent disregard for the law has been galling. He is a career offender in the truest sense of the term, if not as defined by the Sentencing Guidelines. He has committed crimes more or less continuously since the early 1970s, with the breaks in that unfortunate timeline chiefly representing periods in which he has been incarcerated. (Purnell's time in prison also seems to have been far from uneventful, given his in-custody citations for harassment, threats, assault on staff, violent conduct, drug use and insubordination. (PSR ¶ 61.)) The defendant's record strongly suggests what his disrespectful and contentious interactions with the Court throughout the trial and the Probation Office afterwards seem to confirm – Ervan Purnell is an angry man who believes that society's most basic rules do not apply to him.

This ill-founded belief made him a danger to all he encountered on December 23, 2011. And it made him a particular menace to a dedicated public servant named Mohinder Sharma, a pharmacist who walked into his office that morning ready to help people and left, bleeding and semi-conscious, on a gurney – all because he had the nerve to try to call for help when Purnell bullied him.

The pictures of the gash left by the defendant's blow speak for themselves – this was a non-trivial event. The victim missed weeks of work as a result of the injury. He suffered from nightmares and seizures. The VA Medical Center itself has been rocked by the event; the policies and daily operations of the pharmacy have been changed with safety concerns in mind, to the great inconvenience of staff and, ultimately, the veteran patients who go to the Medical Center for care. (PSR ¶ 20.) Thanks to the defendant, a hectic institution that generally wants for pockets of calm and order now has less of both.

The interests vindicated by a Guidelines sentence are thus clear, and the analysis of the sentencing factors under Title 18, Section 3553 of the United States Code becomes simple. Society needs to be protected from the defendant's crimes – and there is no reason to believe that those crimes will abate simply due to the defendant's age. The gravity of the offense, as measured by Mohinder Sharma's staples and the shattered calm at the VA Medical Center, requires adequate redress. And the defendant needs to be taught respect for the law and to be deterred from committing further offenses in a strong way. Given the "seriousness of the offense" and the "need to promote respect for law," and the need for the sentence "to protect the public from further crimes of the defendant" and to adequately deter such conduct, a Guidelines sentence is warranted.

### C. The Defendant's Argument Regarding Recidivism is Unavailing

Citing a 2004 report by the U.S. Sentencing Commission, the defendant observes that "recidivism rates decline relatively consistently as age increases… Offenders over the age of 50

have a recidivism rate of 9.5 percent." (Def. Ltr. 6.) The defendant goes on to argue that, at 59, a Guidelines sentence would result in his "being significantly older when… released from custody and therefore his likelihood of recidivism will also be significantly lower according to the statistics." (Id.)

This argument, as presented, is confusing. To the extent that it supports the notion that a Guidelines sentence would actually decrease the defendant's likelihood of future offenses, as it appears to, the Government can only agree. A Guidelines sentence is appropriate given the statutory requirement that the Court consider the need for deterrence.

If, on the other hand, the argument is actually that the defendant, being older than 50, is unlikely to offend again regardless of the length of his sentence, it bears noting that the defendant, a lifelong criminal who has served several lengthy prison sentences, was well over 50 years old when this offense took place. Even if the statistics the defendant presents are taken at face value – without regard for such variables as offenders' individual criminal histories – the defendant has already solidified his place among the 9.5 percent. The defense assertion that his "arrest, trial and incarceration in this case, at his age and with his medical conditions, have served sufficiently to deter [him] from future crimes" (Id. at 7), is sadly belied by his record. As the Probation Office notes,

> What is most frustrating is that while most individuals with histories such as Purnell "age out" of criminality, the defendant, after being released from his last long stretch of prison, found himself twelve months later using drugs and back in trouble for another serious offense.

(PSR at 25). The Court, in order to protect the public from the defendant's future crimes, must consider that age has already proven a non-deterrent to the defendant in a fashion that sets him apart from 90 percent of the universe of criminal offenders.

### D. The Defendant's Medical Condition Does Not Justify a Downward Variance

[REDACTED] To be sure, the defendant's personal history and characteristics, including his medical condition, are appropriate and relevant considerations at sentencing. But the defendant's medical status should not on its own prompt the Court to depart downward.

It is well established that federal prisons are equipped to provide appropriate medical care to those, like Purnell, who are [REDACTED]

███████████████████████████████████████ Hundreds of similarly afflicted individuals are supervised and cared for in BOP custody, and the other ailments listed by the defendant seem even more within the realm of illnesses commonly treated by the BOP. Purnell's ███████████████████ is not a basis for a non-Guidelines sentence. See, e.g., United States v. ████████████████████████████████████████████████████. Neither are his other health challenges.

## Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the revised Guidelines range, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: *(signature)*

Martin S. Bell
Assistant United States Attorney
(212) 637-2463

cc: Jane Fisher-Byrialsen, Esq. (via e-mail and ECF)